Ida ABRAMOWITZ, derivatively as a shareholder of NVF Company, a Delaware corporation, Plaintiff,

v.

Victor POSNER, Bernard Krakower, Steven Posner, Walter E. Gregg, Gail Posner Cohen and NVF Company, Defendants.

No. 78 Civ. 3887–CSH.

United States District Court, S. D. New York.

March 25, 1981.

Cohn & Lifland, Saddle Brook, N. J., for plaintiff; Peter S. Pearlman and Jeffrey W. Herrmann, Saddle Brook, N. J., of counsel.

Rogers & Wells, New York City, for defendants; William R. Glendon, William S. Greenawalt, Richard A. Cirillo, New York City, of counsel.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This is a stockholder derivative suit brought on behalf of NVF Company ("NVF"), a Delaware corporation, against five of its directors. Claims are asserted under section 10(b) of the Securities and Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78a *et seq.* and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; and under the common law. Jurisdiction is founded upon section 27 of the Act, 15 U.S.C. § 78aa and upon diversity of citizenship. 28 U.S.C. § 1332.

In an Opinion and Order entered June 21, 1979 ("*Posner I*"), disposing of motions in five separate but factually related actions, this Court dismissed the original complaint in this action for failure to satisfy the demand requirement of F.R.Civ.P. 23.1, set forth in full in the margin.[1] Plaintiff at that time had not made any demand on the NVF board of directors (the "Board"), alleging that such a demand was presumptively futile in this case because "the directors and controlling shareholders [were] antagonistic, adversely interested, or involved in the transaction attacked." *Elfenbein v. Gulf & Western Industries, Inc.*, 590 F.2d 445, 450 (2d Cir. 1978). Although the Court held that plaintiff had correctly stated the legal principles involved, it found that the presumption had been rebutted. Accordingly, the Court dismissed the original complaint, but plaintiff was given leave to replead her complaint within sixty days. At 122–125.

Plaintiff subsequently filed an amended complaint reciting claims on behalf of NVF identical to those set forth in the original complaint. The first two counts allege that the individual defendants engaged in various acts of fraud, corporate waste and conversion of NVF assets. Specifically, the complaint charges defendants Victor Posner, Steven Posner and Gail Posner Cohen (the "Posner defendants") with directly or indirectly using corporate funds to pay personal expenses, and further alleges that all of the defendants concealed these transactions and filed false and misleading reports with the SEC, the Internal Revenue Service and the New York Stock Exchange. The third count asserts violations of section 10(b) of the Act and Rule 10b–5, based on allegedly misleading disclosures concerning the transfer of stock from NVF to the defendants. The conduct complained of is alleged to have damaged NVF directly through the loss of corporate assets and indirectly by exposing NVF to unnecessary tax liabilities, to liability resulting from the SEC complaint and private shareholder actions, and to loss of corporate good will. In addition, plaintiff alleges that a demand has been made on the NVF board of directors and rejected.

Defendants now move to dismiss the amended complaint, again relying on the demand requirement of F.R.Civ.P. 23.1. The instant motion, however, unlike defendants' prior motion to dismiss, does not challenge the sufficiency of the demand itself; rather, defendants argue that the

1. F.R.Civ.P. 23.1 states:

"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."

Board's rejection of plaintiff's demand reflects a business judgment determination that maintenance of this action is contrary to the best interests of NVF and as such bars continuation of the action as a matter of law. For the reasons stated, the motion is granted.

## I.

### Related Proceedings

The amended complaint overlaps substantially with claims set forth in a civil complaint filed by the Securities and Exchange Commission ("SEC") in the United States District Court for the District of Columbia. *SEC v. Sharon Steel Corp., et al*, No. 77–1631 (filed September 20, 1977). The circumstances surrounding the SEC action are described more fully in the prior opinion of this Court. It is sufficient to note herein that the SEC complaint exposed grave improprieties on the part of the defendants to that action, among whose ranks are included all of the defendants named in the amended complaint in this action; that on the same date the SEC complaint was filed, all defendants therein filed stipulations consenting to a final judgment granting permanent injunctive and other ancillary relief; that, in so consenting, the defendants neither admitted nor denied the charges; and that the Posner defendants agreed to reimburse NVF and other companies in which they held a controlling position the sum of $600,000 to pay for items alleged to have been improperly received by them.

Pursuant to the terms of the judgment entered in the SEC action, NVF appointed two independent directors, satisfactory to the SEC, to its board of directors. They are James J. Needham, a former member of the SEC and a former Chairman and Chief Executive Officer of the New York Stock Exchange, and Mark A. White, Esq., a former Vice President and General Counsel of the National Association of Securities Dealers. In addition, the two independent directors became a majority of the newly created Audit Committee, whose responsibilities, as set forth in Paragraph VIII of the final judgment, included:

"(e) to examine the matters alleged in the Commission's Complaint, and such other similar matters as each Audit Committee may deem appropriate, in order to recommend whether, in the best interests of the corporation, any action should be undertaken against any person, including the institution of any action permitted by Paragraph VI hereof, and to make recommendations with respect thereto to the Board of Directors of the respective corporations; provided that no person who is a subject of any such recommendation by an Audit Committee who serves on the Board of Directors of any such corporation shall vote upon any such recommendation; (f) within 120 days from the appointment of the Audit Committee, or such additional time as the Commission may reasonably agree, to submit to the Board of Directors and to file with the Commission in the public files of the corporation, a report or reports of its findings and recommendations pursuant to Subparagraphs (a) through (e) above, including a description of the scope of their investigation." [2]

---

2. Paragraph VI, referred to in Paragraph VIII(e), provides:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that [the Posner] defendants shall pay to ... NVF [and other companies] and/or their subsidiaries the sum of $600,000 to reimburse such corporations for things of value alleged to have been improperly received by [the Posner defendants], one-half of such sum to be paid to such corporations and/or their subsidiaries within 90 days of the entry of this Final Judgment, and the remainder to be paid within an additional 120 days. The reimbursement to such corporations shall be made either to the corporation or corporations having directly borne the original expense, or, in the case of prorated expenses, in proportion to their allocated share of such expenses. Nothing in this Final Judgment or these proceedings shall be deemed to prevent any related company or any other person from making any claim against [the Posner defendants] or any other person for any purpose, including any claim for any benefit or other thing of value alleged to have been improperly received by, or on behalf of, [the Posner defendants]."

The third member of the Audit Committee, Armer E. White,[3] was nonindependent as that term was defined by the SEC judgment, in that he had been a member of the NVF Board since 1969; he was, however, an outside director who was not named as a defendant either in the SEC action or in the case at bar.

*Recommendations of the Audit Committee*

The Audit Committee, with the aid of the Washington, D. C. law firm of Arnold & Porter and the national accounting firms of Price Waterhouse & Co. and Arthur Andersen & Co., conducted an exhaustive investigation into the matters raised by the SEC action.[4] On November 22, 1978, the Committee filed its report (the "Report"), 213 pages in length, which made various recommendations as to policies and procedures to be implemented to prevent a recurrence of the improprieties alleged in the SEC complaint. With respect to the matters underlying the claims of waste and conversion asserted herein, the Report recommended that the various companies involved [5] seek reimbursement from the individual defendants herein totalling $1,021,445, such sum to be in addition to the $600,000 previously paid to the companies by the Posner defendants in accordance with the SEC judgment.

The Audit Committee recognized the mandate of Paragraph VIII(e) of the SEC judgment, that the Committee make its own determination whether, in the best interests of NVF, any further action, legal or otherwise, should be taken against any of the defendants in the SEC action. Report at 7; 23–24. Accordingly, a Joint Legal Subcommittee was formed to monitor the examination conducted pursuant to Paragraph VIII(e). *Id.* at 13. The Audit Committee concluded that legal action was not, as an initial course of action, in the best interests of NVF, and that such action

should be resorted to only in the event that the additional reimbursement described above was not received. *Id.* at 30. In explaining its findings, the Report stated:

"Since Victor Posner acquired control of the companies, they have generally achieved profitability and substantial growth in sales. The Audit Committees believe the business success of the companies represents a significant accomplishment by Mr. Posner and the other officers of the companies responsible for management during this period.

"Nevertheless, the Audit Committees believe that Mr. Posner and certain other officers who are directors of the companies, including those named in Count I of the Commission's Complaint, also bear major responsibility for the matters investigated by the Audit Committees and discussed herein. The Audit Committees believe that these matters occurred because of those persons' failure to act in accordance with their important responsibilities as officers and directors of publicly held companies. However, the Audit Committees further believe that the corrective measures already being taken by the companies, and the policies, procedures and controls adopted by the Audit Committees, should prevent recurrence of these matters." *Id.* at 20.

The Audit Committee further:

"concluded that under Paragraph VIII(e) of the Final Judgment, they would recommend only the seeking of reimbursement and recovery of amounts due the companies. In reaching this conclusion, the Audit Committees considered the corrective actions already taken by the management of the companies, the impact of the policies, procedures and controls being adopted pursuant to Paragraphs VIII(a)–(c) of the Final Judgment, the flexibility inherent in the continuing authority of the Committees to maintain

---

**3.** Mark White and Armer White are not related.

**4.** The investigation and the report and recommendations resulting therefrom were prepared jointly by the Audit Committees of NVF, Southeastern Public Service Co., Wilson Broth-

ers, Sharon Steel Corp., DWG Corp., and Pennsylvania Engineering Corp., which are all affiliated companies. The latter three were named as defendants in the SEC action.

**5.** *See* note 4 *supra.*

and supervise the implementation of those policies, procedures and controls, and the injunctive provisions of the Final Judgment." *Id.* at 29–30.

Finally, the Audit Committee recognized that the liability of the various persons involved might be greater if determined through court action, but nevertheless reasserted its conclusion that such recourse was not in the best interests of NVF:

"In recommending the amount of reimbursement to be sought, the Audit Committees sought in each case to ascertain, based on the facts, an amount that is both fair and equitable to the officer or director from whom it was determined that reimbursement should be sought and fair and equitable to the companies and their stockholders. The amounts which the Audit Committees have recommended should be reimbursed may not necessarily be the maximum amounts which the companies could obtain from such officers or directors in an action naming them as defendants, where the full range of judicial procedures for the ascertainment of facts would be available, or if presumptions arising from the absence of appropriate records were utilized to determine the amounts due. Still, the amounts specified in this Report are those which the Audit Committees believe under all the facts and circumstances should be reimbursed to the companies." *Id.* at 41–42.

At a meeting held on December 18, 1978, the NVF board of directors, with the defendant-directors named in the Report of the Audit Committee not voting, unanimously agreed to adopt every one of the Committee's recommendations. Subsequent thereto, full reimbursement was made to the companies by the individual defendants herein.

*The Rule 23.1 Demand*

As noted above, this Court in *Posner I* dismissed the original complaint because of plaintiff's failure to make any demand under F.R.Civ.P. 23.1 on the NVF Board to take over the instant action. Pursuant to the terms of that opinion, plaintiff, through her attorneys, made a demand on the NVF board of directors by letter dated July 12, 1979, the terms of which are set forth in the margin.[6] At its regular meeting on July 31, 1979, plaintiff's demand was unanimously rejected by those directors present and voting as not in NVF's or its shareholders' best interests. Messrs. Needham and M. White, the two independent directors, were among those directors who voted on the demand; not voting were the individual defendants

---

**6.** The letter demanded that the NVF Board institute civil litigation and remove certain directors from its ranks:

"A. That civil action be instituted by NVF Company against Victor Posner, Steven Posner, Bernard Posner, Gail Posner Cohen for damages including interest and costs resulting from their use of the assets and services of the Company and its subsidiaries for personal purposes and for the diversion of corporate funds for the renovation and enhancement of properties owned either directly or indirectly by these individuals. Such a litigation should seek reimbursement to the corporation for costs incurred by the corporation and its subsidiaries in defending actions brought by either the S.E.C. or shareholders as a result of the improper diversion of corporate assets by these individuals. The Company should also seek reimbursement for all claims paid to or on behalf of any shareholders or class of shareholders as a result of the improper diversion of corporate assets by the individuals aforesaid.

"B. That civil litigation be instituted against all members of the Board of Directors of NVF who served the company from 1970 until 1977 for damages that have been and will be sustained by the Company as a result of the Company's misstatements of earnings. Such litigation should seek reimbursement to the Company for the costs incurred by the Corporation in defending actions brought by either the S.E.C. or shareholders and seek indemnification from those directors for any damages awarded in class actions brought against NVF of Sharon Steel Corporation.

"C. That civil litigation be instituted against all members of the Board of Directors of NVF who had any knowledge of the diversions of corporated [sic] assets and services by Victor Posner, Steven Posner, Bernard Posner and/or Gail Posner Cohen seeking damages including interest and costs.

"D. That any and all directors who served the company during the time these misleading financial statements were given should be removed for cause from the Board of Directors."

herein and Bernard Posner, defendant Victor Posner's brother.

Not receiving a response by then, plaintiff filed her amended complaint on August 30, 1979, stating that "[n]o response to this demand has been received from the Board of Directors and accordingly the plaintiff has no recourse but to initiate this action." Amended Complaint, ¶ 13. The Board's rejection of her demand was subsequently communicated to plaintiff by letter dated August 17, 1979. In that letter, plaintiff was informed that the matters raised in her demand were the subject of the Audit Committee Report and that the Committee's recommendations had been adopted in their entirety by the NVF Board. Nevertheless, plaintiff refused to withdraw the amended complaint. This motion followed.

In support of the motion to dismiss, defendants contend that the demand requirement of F.R.Civ.P. 23.1 contemplates more than the mere making of a demand and its subsequent rejection before a plaintiff can bring suit derivatively on behalf of the corporation. Rather, defendants urge that the business judgment rule applies to this situation; that is, that a determination by a board of directors in the exercise of its business judgment that proposed litigation is not in the corporation's best interests is conclusive and bars maintenance of a derivative action, absent a showing of bad faith not made here.

Plaintiff opposes the motion in all respects. Plaintiff argues that relevant state law does not permit invocation of the business judgment rule in the manner put forward by defendants and that, even if state law gave the Board the authority to terminate a derivative action, condoning the exercise of that authority herein would be contrary to the policies underlying Section 10(b) of the Act and Rule 10b–5. Furthermore, plaintiff contends that the business judgment rule as construed by defendants is inapplicable to the facts of this case for two reasons. First, she claims that the matters investigated and recommended on by the Audit Committee do not completely overlap with the matters alleged in the amended complaint. Second, she avers that notwithstanding the fact that the defendant directors did not vote on whether to accept or reject her demand, the NVF board was and is dominated by the defendant-directors and as such could not and did not make a good faith and independent decision to reject her demand.

I consider these arguments in turn.

## II.

■ The business judgment rule, a well-established doctrine of corporate law, "bars judicial inquiry into actions of directors taken in good faith and in honest pursuit of the legitimate purposes of the corporation." *Galef v. Alexander*, 615 F.2d 51, 57 (2d Cir. 1980); *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994, 999 (1979); *see* 13 W. Fletcher, Corporations, § 5969 (1970 rev. vol. & Supp. 1978). The doctrine has been successfully invoked by defendant-directors as a substantive defense in suits alleging that they have engaged in internal wrongdoing or other improper decision-making, *see, e. g., Gimbel v. Signal Cas., Inc.*, 316 A.2d 599 (Del.Ch.), *aff'd*, 316 A.2d 619 (Del.Sup.Ct.1974); *Blish v. Thompson Automatic Arms Corp.*, 30 Del.Ch. 538, 64 A.2d 581, 606 (Del.1948), and by the board of directors of the nominal corporate defendant in seeking to dismiss stockholder derivative suits brought against third parties when the board has determined that the action is not in the best interests of the corporation or its stockholders. *See, e. g., United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–64, 37 S.Ct. 509, 510–511, 61 L.Ed. 1119 (1917); *Ash v. IBM*, 353 F.2d 491, 493 (3d Cir. 1965), *cert. denied*, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); *Klotz v. Consolidated Edison Co.*, 386 F.Supp. 577, 581–84 (S.D.N.Y.1974). The issue presented by the case at bar is whether the business judgment rule should be extended to permit noninterested members of the board of directors of the nominal corporation to dismiss a stockholder derivative suit brought against interested members of the board.

The proper resolution of this issue requires three separate but related inquiries. The first two, which involve questions of law, were recently described by the Supreme Court in *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1978). In that case, brought under the Investment Company Act of 1940 and the Investment Advisers Act of 1940, the Court set forth the analysis to be applied in determining whether five of an investment company's noninterested directors, acting as a quorum, having determined that a derivative suit brought on the company's behalf against several of the company's interested directors and its investment adviser was not in the best interests of the corporation, could successfully move to dismiss the derivative suit. The threshold inquiry is whether applicable state law confers upon a nominal corporate defendant's disinterested directors the authority to terminate the derivative suit based upon the business judgment rule. *Id.* at 477–480, 99 S.Ct. at 1836–1838. If it does, the next question is whether the exercise of that authority would be consistent with the policies of the federal statutes giving rise to the cause of action. *Id.* at 480, 99 S.Ct. at 1838. The third examination, to be undertaken only if the previous two questions are answered affirmatively, is primarily a factual one: whether the board members exercised their discretion independently and in good faith. *See generally, Galef, supra.*

### III.

It is not disputed that the law of Delaware, NVF's state of incorporation, is the law to be applied herein to determine whether the noninterested members of the NVF board of directors have the authority to terminate this action by invoking the business judgment rule. *See Burks, supra,* 441 U.S. at 478, 99 S.Ct. at 1837; *Galef, supra,* 615 F.2d at 58, 62; *Abbey v. Control Data Corp.,* 603 F.2d 724, 728–29 (8th Cir. 1979). The Supreme Court of Delaware not having ruled on the issue, it is incumbent upon this Court to sit as a state court and determine the Delaware rule, giving "proper regard" to rulings of lower Delaware courts and other federal courts. *See Commissioner of Internal Revenue Service v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Lewis v. Anderson,* 615 F.2d 778, 781 (9th Cir. 1979).

■ The clear trend in corporate law supports defendants' position that the business judgment rule is sufficiently broad to permit disinterested, independent directors to terminate a derivative suit brought against other corporate directors.[7] The Court of Appeals for the Eighth Circuit followed this course in construing Delaware law. *Abbey, supra; accord, Maldonado v. Flynn,* 485 F.Supp. 274 (S.D.N.Y.1980), *appeal docketed,* No. 80–7221 (2d Cir. 1980) (*"Maldonado-Fed"*); *Siegal v. Merrick,* No. 74–2475 (S.D.N.Y. Dec. 20, 1979). Although I am cognizant of the opinion of the Vice Chancellor in *Maldonado v. Flynn,* 413 A.2d 1251 (Del.Ch.1980) (*"Maldonado-Del."*); *accord, Maher v. Zapata Corp.,* 490 F.Supp. 348 (S.D.Tex.1980), which holds to the contrary, I conclude that the result reached in the former cases is better supported by Delaware law.

■ The Courts in *Abbey* and *Maldonado-Fed* recognized that Delaware has long

---

7. *See, e. g., Clark v. Lomas & Nettleton Financial Corp.,* 625 F.2d 49, 52 (5th Cir. 1980) (construing Texas law); *Lewis v. Anderson,* 615 F.2d 778, 782–83 (9th Cir. 1979) (construing California law); *Abbey v. Control Data Corp.,* 603 F.2d 724, 729–30 (8th Cir. 1979) (construing Delaware law); *Genzer v. Cunningham,* 498 F.Supp. 682, 687 (E.D.Mich.1980) (construing Michigan law); *Maldonado v. Flynn,* 485 F.Supp. 274, 278–81 (S.D.N.Y.1980) (construing Delaware law), *appeal docketed,* No. 80–7221 (2d Cir. 1980); *Siegal v. Merrick,* No. 74–2475, slip op. at 10–11 (S.D.N.Y. Dec. 20, 1979) (construing Delaware law); *Auerbach v. Bennett,* 47 N.Y.2d 619, 623, 419 N.Y.S.2d 920, 922, 393 N.E.2d 994, 996 (1979) (construing New York law); *cf. Galef v. Alexander,* 615 F.2d 51 (2d Cir. 1980) (discussion of directors' good faith without deciding Ohio law). *Contra, Abella v. Universal Leaf Tobacco Co., Inc.,* 495 F.Supp. 713, 717 (E.D.Va.1980) (construing Virginia law); *Maher v. Zapata Corp.,* 490 F.Supp. 348, 351–53 (S.D.Tex.1980) (construing Delaware law); *Maldonado v. Flynn,* 413 A.2d 1251, 1257 (Del.Ch.1980) (construing Delaware law).

permitted reliance on the business judgment rule both as a substantive defense and to permit the board of directors of the nominal corporate defendant to terminate a derivative suit against unrelated third parties. As the Supreme Court of Delaware has stated:

> "We think the fact that a disinterested Board of Directors reached this decision [to grant the challenged stock options] by the exercise of its business judgment is entitled to the utmost consideration by the courts in passing upon the results of that decision. Such has long been the law of this State.
>
> \*    \*    \*    \*    \*    \*
>
> "[W]e are precluded from substituting our uninformed opinion for that of experienced business managers of a corporation who have no personal interest in the outcome and whose sole interest is the furtherance of the corporate enterprise."

*Beard v. Elster,* 39 Del.Ch. 153, 160 A.2d 731, 738–39 (1960) (citation omitted). The power of the board to manage the corporation without improper judicial or shareholder interference includes within its scope the power to conduct the corporation's litigation—for example, whether to institute litigation in the first instance, abandon the litigation, or settle the action. *See Mayer v. Adams,* 37 Del.Ch. 298, 141 A.2d 458, 461 (1958); *Perrine v. Pennroad Corp.,* 29 Del.Ch. 531, 47 A.2d 479, 487 (1946), *cert. denied,* 329 U.S. 808, 67 S.Ct. 620, 91 L.Ed. 690 (1947). Justice Brandeis first developed this proposition in *United Copper Securities, supra,* wherein the Supreme Court held that a shareholder could not maintain a derivative suit against third parties for alleged violations of the Sherman Act when the directors had refused in good faith to sue:

> "Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion, *intra vires* the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment...." 244 U.S. at 263–64, 37 S.Ct. at 510.

Furthermore, the business judgment rule may properly be invoked by disinterested directors, acting independently, even when some board members, because of their interest in the transaction, are disqualified from participating in the board's decisions. *Maldonado-Fed, supra,* 485 F.Supp. at 279; *Puma v. Marriott,* 283 A.2d 693, 695–96 (Del.Ch.1971) ("since the transaction complained of was accomplished as a result of the exercise of independent business judgment of the outside, independent directors whose sole interest was the furtherance of the corporate enterprise, the court is precluded from substituting its uninformed opinion for that of the experienced, independent board members...."). This rule is reflected in the various provisions of the Delaware General Corporation law which authorize the board to appoint committees with the authority to conduct most of the corporation's business and which empower a majority of the disinterested directors to approve transactions between the corporation and interested directors.[8]

The Court in *Abbey* stated:

---

8. For example, Del.Gen.Corp.Law § 141(c) provides:

> "The board of directors may, by resolution passed by a majority of the whole board, designate 1 or more committees, each committee to consist of 1 or more of the directors of the corporation. The board may designate 1 or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. The bylaws may provide that in the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the board of directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the reso-

"[Plaintiff] has cited no Delaware cases holding that the applicability of the business judgment rule hinges on the nature of the plaintiff-shareholder's cause of action. And we find no merit to his argument that the rule is inapplicable where the defendant-directors are charged with criminal misconduct. As a matter of Delaware law, we agree with the district court that the rule apparently applies to any reasonable good faith determination by an independent board of directors that the derivative action is not in the best interests of the corporation." 603 F.2d at 729–30.

This Court concurs in this conclusion notwithstanding the decision in *Maldonado-Del., supra,* which was handed down subsequent to the opinion in *Abbey* and *Maldonado-Fed, supra.*

*Maldonado-Del.* and *Maldonado-Fed* involved the same parties and the same underlying transactions; the motions to dismiss in each were based on the same board determination that litigation arising from the subject transactions was not in the best interest of the corporation or its shareholders. The court in *Maldonado-Fed* dismissed the action; the court in *Maldonado-Del.,* although aware of the decision in the federal suit, denied the motion.[9]

The Delaware court based its decision on the dual nature of the derivative suit as it historically developed:

" 'A bill filed by stockholders in their derivative right therefore has two phases—one is the equivalent of a suit to compel the corporation to sue, and the other is the suit by the corporation, asserted by the stockholders in its behalf, against those liable to it. The former belongs to the complaining stockholders; the latter to the corporation. The com-

---

lution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the certificate of incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the corporation's property and assets, recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, or amending the bylaws of the corporation; and, unless the resolution, bylaws, or certificate of incorporation expressly so provide, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock."

Del.Gen.Corp.Law § 144 provides:

"(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

"(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

"(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

"(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee, or the shareholders.

"(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction."

9. At the outset, it is important to note that in an opinion and order filed some two and one-half months after the Vice-Chancellor denied the motion to dismiss based on the business judgment rule, he granted defendants' motion to dismiss based on the res judicata effect of the dismissal in *Maldonado-Fed.* 417 A.2d 378 (Del.Ch.1980). The court, however, held the dismissal in abeyance pending resolution of *Maldonado-Fed* on appeal.

plaining stockholders are allowed in derivative bills to bring forward these two causes of action in one suit. But any recovery granted by the decree necessarily is in favor of the corporation. The complaining stockholders secure nothing to themselves as individuals, beyond the mere right, which is inherent in the decree for relief to the corporation, of compelling their recalcitrant corporation to accept the relief which the decree affords.'

"The dual nature of the derivative suit has been continuously recognized in Delaware. It is this dual nature of the derivative suit which denies the corporation the right to compel the dismissal of a properly brought stockholder's derivative action, because the stockholder asserts in the suit not only a right belonging to the corporation but also a right individual to himself." *Maldonado-Del., supra,* 413 A.2d at 1261–62, *quoting Cantor v. Sachs,* 18 Del.Ch. 359, 162 A. 73, 76 (1932) (citations omitted).

The vice-chancellor in *Maldonado-Del.* would apply the business judgment rule when the derivative suit is brought against an extracorporate defendant, *see* 413 A.D.2d at 1258–60, or when it is invoked as a defense by the defendant-directors at the trial on the merits, *id.* at 1256, but held that the rule could not be applied to bar initially the maintenance of actions brought against some but not all of the corporation's directors. I do not agree, however, that his dual nature analysis compels the conclusion that applicability of the business judgment rule depends on the nature of the shareholder's cause of action or the identity of the defendants. Such a distinction would only serve to confuse the legal question of whether the board of directors possesses the *authority* to terminate the derivative suit with the factual question of whether that authority was exercised properly, a result not mandated by *Cantor, supra.* The *Cantor* court, while recognizing a stockholder's individual right to maintain a derivative action, seemingly limited that equitable right to instances when "the corporation will not sue *because of the domination over it by the alleged wrongdoers* who are its directors." *Cantor, supra,* 162 A. at 76 (emphasis added). I do not read *Cantor* to impose a *per se* ban on using the business judgment rule in the circumstances before me; but rather to require an investigation into the *bona fides* of the directors.

Moreover, adopting the position of the Delaware court would render meaningless the demand requirement found in F.R. Civ.P. 23.1 and many state statutes, including Delaware's. Del. Rules Ct. Ch. 23.1. Such a construction of the demand requirement has been consistently rejected:

"It is obvious that the requirement that a stockholder, before filing a derivative action on behalf of his corporation, must first demand of its board of directors that it cause such an action to be instituted, does not mean that the board's refusal on demand to act, ipso facto, clears the way for a suit by the demanding stockholder on behalf of the corporation. If it were so, the making of the demand would become a meaningless mechanical operation. If the directors who constitute a majority of the board and who reject the demand are dishonest, guilty of a breach of trust, were participants in the fraudulent acts relied upon by the stockholder as a basis for the legal action which he demands, or are subject to the control of the alleged wrongdoers, then equitable jurisdiction may be invoked and he may proceed to file the suit himself. However, if the majority are honest, not guilty of a breach of trust, not subject to the control of the alleged wrongdoers, and were not participants in the fraud charged, he may not sue."

*Swanson v. Traer,* 249 F.2d 854, 858 (7th Cir. 1957) (affirming dismissal of derivative suit brought against directors of nominal corporate defendant, among others); *Siegal, supra,* slip op. at 7–8.

I find, therefore, that Delaware law permits disinterested, independent numbers of the NVF Board to terminate a derivative suit alleging impropriety by other members of the board.

## IV.

■ Turning next to the second prong of the *Burks* analysis, I conclude that the business judgment rule as construed above is consistent with the federal policies underlying Section 10(b) of the Act and Rule 10b–5.

Guidance can be drawn from the cases applying the business judgment rule in actions involving other securities regulations.[10] The rationale of those cases was cogently stated by Judge Weinfeld in *Maldonado-Fed, supra*, which involved Section 14(a) of the Act:

"Plaintiff's position misapprehends both the effect and scope of the state law rule applicable here. In the first instance, it is clear that the rule does not infringe directly upon the protections accorded investors by the regulatory scheme of section 14(a). It does not condone conduct violative of that section. Further, it may be noted that protection of investors is also a fundamental purpose of the Investment Company Act. Indeed that Act contains a provision concerned with proxies analogous to section 14(a). In *Burks*, as noted, the Court strongly indicated that a rule such as the one involved here was consistent with the Investment Company Act. Thus an underlying policy of investor protection was not regarded as necessarily inconsistent with the business judgment rule in appropriate circumstances.

"Plaintiff's argument also implies incorrectly that derivative actions are the sole private means of redressing violations of section 14(a) and enforcing the Congressional policy of protecting investors. The cause of action implied under section 14(a), however, can also be asserted by an individual shareholder in his own behalf or as a class action on behalf of all affected shareholders and therefore the business judgment rule cannot be said to preclude private enforcement of the proxy rules. Moreover, as the Supreme Court made clear in the *Borak* case [*J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423] the basis for permitting an action under section 14(a) to be brought derivatively was that violations may injure the corporation as a whole. Thus, the effect of applying the business judgment rule is not to curtail enforcement of federally created rights but merely to provide that where such rights inure to the corporation they are to be exercised by the body to whom state law allocates the power and duty to press those rights—initially to the directors of the corporation and secondarily to the shareholders where the whole board is disqualified. If this derivative claim is not pursued, plaintiff is free to assert his independent claim in an appropriate action.

"The cornerstone of the business judgment rule is the independence and disinterestedness of the directors charged with responsibility for decisions. It requires a group of directors who are genuinely independent of the disqualified board and disinterested in the action; it requires them to exercise their business judgment in fact and to do so in good faith. No court is required to take for granted that these conditions have been met and the shareholder is free to challenge the committee's bona fides. With these inherent limitations in play, there is simply no merit to plaintiff's contention that application of the business judgment rule in the instant case renders section 14(a) meaningless or is inconsistent with the basic policy underlying that section." 485 F.Supp. at 281–82.[11]

10. *See* cases cited in note 7 *supra*.

11. *Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980), another case involving Section 14(a) of the Act, relied on by plaintiff in support of her position that the business judgment rule is inconsistent with the Act, is not to the contrary. Rather, the *Galef* Court held that Section 14(a) would be frustrated if the Court were to defer to a business judgment determination that the derivative action should not proceed made by, or under the influence of, the *defendant-directors*. *E. g., id.* at 64 ("we conclude that to the extent that a complaint states claims against directors under § 14(a) upon which relief may be granted, federal policy prevents the summary dismissal of those claims *pursuant to the business judgment of those defend-*

The analogy between suits brought under Section 14(a) and the case at bar, brought under Section 10(b), is complete. Both sections are part of a comprehensive regulatory scheme designed to protect investors and prevent manipulation of stock prices. The goal of Section 14(a) is to ensure complete disclosure, *see Galef, supra,* 615 F.2d at 63; plaintiff concedes that her "claim seeks the same type of protection sought by the plaintiff in *Galef* [a Section 14(a) case], relief to the corporation for the director's [sic] violation of the disclosure laws of the Exchange Act." Plaintiff's Supplemental Memorandum in Opposition, at 7–8. As with Section 14(a), violations of Section 10(b) can also be asserted by a shareholder suing in his own behalf, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196–97, 96 S.Ct. 1375, 1382–1383, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975); thus the holding herein does not provide wrongdoers with a means to escape all liability. Finally, the purpose of allowing a derivative suit under any federal law is to redress injuries to the corporation itself.

Accordingly, I agree with the conclusion of the one court that has thus far expressly addressed the interplay between the business judgment rule and Section 10(b):

"As we have seen, 'the overriding purpose of Section 10(b) and Rule 10b–5 was to protect the purity of the securities market and ... private claims for relief thereunder are a means to that end.' *Rochelle v. Marine Midland Grace Trust Co. of N. Y.,* 535 F.2d 523, 532–33 (9th Cir. 1976). We see no threat to the purity of the securities market from our interpretation of California law."

*Lewis, supra,* 615 F.2d at 783; *see Cramer v. General Telephone & Electronics Corp.,* 582 F.2d 259, 273–76 (3d Cir. 1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979).

## V.

■ Turning next to the final consideration—whether the decision to terminate the instant action was truly a good faith and independent one—two things must be noted at the outset. First, the determination is a factual one. Hence, application of the principles governing summary judgment seems particularly appropriate and the complaint will be dismissed only if I find an absence of material issues of fact. *See* F.R.Civ.P. 56. This is so notwithstanding defendants' characterization of their motion as requiring little more than a judicial interpretation of the pleading requirements of F.R.Civ.P. 23.1. Defendants' Supplemental Memorandum at 6. *See Galef, supra,* 615 F.2d at 59–61; *cf. Maldonado-Fed, supra* (motion characterized as one to dismiss the complaint or for summary judgment). Second, the inquiry should not focus on whether the directors who voted to reject the plaintiff's demand and the Audit Committee on whose recommendation they relied were correct in their determinations, or whether plaintiff's cause of action is a meritorious one, for the board may decide for various reasons to bar even nonfrivolous actions. *See Maldonado-Fed, supra,* 485 F.Supp. at 285; *Auerbach, supra,* 419 N.Y.S.2d 920, 928–29, 393 N.E.2d 994, 999–1000. As the *Auerbach* Court noted, the ultimate substantive decision whether to litigate:

"... falls squarely within the embrace of the business judgment doctrine, involving as it did the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems.... Thus, the courts cannot inquire as to which factors were considered by that committee or that relative weight accorded them in reaching that substantive decision—'the reasons for the payments, the advantages or disadvantages accruing to the corpora-

*ant directors....* The [*Burks*] Court's conclusion that the policies of the Investment Company Act 'hardly justify a flat rule that directors may never terminate nonfrivolous derivative actions involving co-directors,' ... does not

imply that directors may terminate nonfrivolous derivative actions under § 14(a) *against themselves.*" (citation omitted) (emphasis added)).

tion by reason of the transactions, the extent of the participation or profit by the respondent directors and the loss, if any, of public confidence in the corporation which might be incurred.'" 419 N.Y.S.2d at 928, 393 N.E.2d at 1002 (citation omitted).

The *Auerbach* Court further compared those factors which are consequently insulated from judicial review with those that are properly considered in determining the *bona fides* of the directors and their investigation:

"[T]hose responsible for the procedures by which the business judgment is reached may reasonably be required to show that they have pursued their chosen investigative methods in good faith ... [They] may be expected to show that the areas and subjects to be examined are reasonably complete and that there has been a good-faith pursuit of inquiry into such areas and subjects. What has been uncovered and the relative weight accorded in evaluating and balancing the several factors and considerations are beyond the scope of judicial concern. Proof, however, that the investigation has been so restricted in scope, so shallow in execution, or otherwise so pro forma or half-hearted as to constitute a pretext or sham, consistent with the principles underlying the application of the business judgment doctrine, would raise questions of good faith or conceivably fraud which would never be shielded by that doctrine." *Id.* at 929, 393 N.E.2d at 1002.

Plaintiff's attack on the directors' rejection of her demand is three-fold. First, she disputes their independence, relying on the Posner defendants' status as NVF board members and substantial shareholders in the company to support her claim that the NVF directors serve, or are forced to leave their positions, at the whim of the Posners. Plaintiff therefore opines that "it is unrealistic to expect the directors to approve of litigation which seeks to vigorously prosecute the Posners for *all* of the damages which the corporation has suffered as a consequence of the defendants' acts." Plaintiff's Brief in Opposition, at 15. In addition, plaintiff alleges that the two outside directors, Messrs. Needham and M. White, were not in a position to exercise unbiased judgment, asserting that acceptance of her demand would impugn their own investigation and recommendations made as members of the Audit Committee. Of related significance, plaintiff contends that the Audit Committee report, which served as the basis for the Board's rejection of her demand, did not examine all allegations or injuries raised in her complaint.

Plaintiff is correct in stating that directors cannot invoke the business judgment rule when they are guilty of breach of trust, or when they stand in a dual relation which prevents an unbiased exercise of judgment. *United Copper Securities, supra,* 244 U.S. at 263–64, 37 S.Ct. at 510–511. However, plaintiff misapprehends the effect of this rule on the case at bar and her claims are simply not supported by evidentiary facts. The Posner defendants own only 18.8% of the NVF stock;[12] thus, the public majority, acting pursuant to Delaware law, has the power to retain or discharge the incumbent directors despite the wishes of the Posner family. Furthermore, the defendant-directors, as well as another member of the Posner family not named as a defendant herein, did not vote on plaintiff's demand; defendant Gail Posner Cohen was not even present at the meeting nor has she been actively involved in the management of NVF for a substantial period of time. Nor is a contrary conclusion required because the complaint and demand letter referred to some of the voting directors in a general manner, at least where, as here, there are no allegations that any of those directors profited personally from the underlying transactions. *See Galef, supra,* 615 F.2d at 60 n.17, *citing with approval, Klotz v. Consolidated Edison Co.,* 386 F.Supp. 577 (S.D.N.Y.1974).

12. The Audit Committee report notes that if the Posner defendants converted and exercised all outstanding securities, they would own approximately 40.6% of the NVF stock.

Moreover, neither the methods of the Audit Committee upon whose recommendation the Board resolution was based, nor the qualifications or integrity of its members can be impugned. Messrs. Needham and M. White, the two independent directors, were named to the Board and the Committee, with the approval of the SEC, because of their independence;[13] Mr. A. White, although a director of NVF during the period at issue herein, was an outside director and has no stake in this litigation. The Committee was guided throughout by advice from lawyers from Arnold & Porter and accountants from Arthur Andersen & Co. and Price Waterhouse & Co. The members were aware of the SEC action and the pendency of plaintiff's litigation; they expressly recognized the gravity of the charges lodged against the defendant-directors by the SEC and expressly rejected recourse to litigation in favor of monetary reimbursement, a decision which, under the principles of *Auerbach*, I cannot question. Notwithstanding plaintiff's unsupported claims to the contrary, it is clear that the Committee investigated all of plaintiff's allegations. Suffice it to note that plaintiff's complaint substantially overlaps with that of the SEC; and rather than ignore the collateral effect of the defendants' alleged conduct on the corporation, as plaintiff contends, the Committee made its recommendations because of the positive effect of the Posner management on NVF. *See* Part I *ante*.

Acceptance of plaintiff's position would require a holding that a corporate board is powerless to act, through independent members, whenever it has among its body an interested director. Plaintiff has cited no cases to support this proposition, nor would it comport with established corporate law which allows disinterested directors to exercise their business judgment in approving corporate deals with interested directors. *See, e. g.*, Del. Gen'l Corp. Law § 144(a). In fact, the courts that have been confronted with the identical argument have rejected it:

"The board in this instance, with slight adaptation, followed prudent practice in observing the general policy that when individual members of a board of directors prove to have personal interest which may conflict with the interest of the corporation, such interested directors must be excluded while the remaining members of the board proceed to consideration and action.... To accept the assertions of the intervenor and to disqualify the entire board would be to render the corporation powerless to make an effective business judgment with respect to prosecution of the derivative action. The possible risk of hesitancy on the part of the members of any committee, even if composed of outside, independent, disinterested directors, to investigate the activities of fellow members of the board where personal liability is at stake is an inherent, inescapable, given aspect of the corporation's predicament. To assign responsibility of the dimension here involved to individuals wholly separate and apart from the board of directors would, except in the most extraordinary circumstances, itself be an act of default and breach of the nondelegable fiduciary duty owed by the members of the board to the corporation and to its shareholders, employees and creditors. For the courts to preside over such determinations would similarly work an ouster of the board's fundamental responsibility and authority for corporate management."

*Auerbach, supra*, 419 N.Y.S.2d at 927–28, 393 N.E.2d at 1001; *accord, Lewis, supra*, 615 F.2d at 783.

Plaintiff has sought no discovery with respect to the good faith and independence of the Board members and has introduced no evidentiary proof that would raise a factual question as to their *bona fides*. Her argument is based on no more than innuen-

---

**13.** It should be noted that even if all other members of the Board had been disqualified from voting on plaintiff's demand because of interest, the affirmative vote of Messrs. Needham and M. White would have been sufficient to support the resolution. Del.Gen.Corp.Law §§ 141(b), 144; NVF By-Laws Art. IV, § 6.

do and the opinion "that it is asking too much of human nature to expect that disinterested directors will view with the necessary objectivity the actions of their colleagues in a situation where an adverse decision would be likely to result in considerable expense and liability for the individuals concerned." *Lasker v. Burks*, 567 F.2d 1208, 1212 (2d Cir. 1978), *rev'd*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). The Supreme Court, on appeal, expressly disavowed the quotation relied on by plaintiff in the context of the Investment Company Act, 441 U.S. at 485 n.15, 99 S.Ct. at 1840 n.15, and I reject this jaundiced view of human nature in the instant case.

## CONCLUSION

Plaintiff has failed to satisfy the demand requirement of F.R.Civ.P. 23.1.

The Clerk of the Court is directed to enter judgment in favor of defendants dismissing the complaint.

It is So Ordered.